IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **CHRISTINE WELLER,** | § § § § | |
| *Plaintiff,* | § § | |
| vs. | § § § | **CIVIL ACTION NO. _____** |
| **AMERICAN COLLEGE OF EMERGENCY PHYSICIANS** | § § § § | |
| *Defendant.* | § § § | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes Plaintiff Christine Weller ("Plaintiff" or "Weller"), complaining of Defendant American College of Emergency Physicians ("Defendant" or "ACEP") and in support thereof shows the Court as follows:

### I.

### INTRODUCTION

1.01   Defendant American College of Emergency Physicians wrongfully fired Plaintiff from her job in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* (the "FMLA").

### II.

### PARTIES

2.01   Plaintiff Christine Weller is an individual who is a citizen of the State of Texas. Plaintiff can be contacted in care of her undersigned counsel.

2.02　　Defendant American College of Emergency Physicians is a domestic non-profit corporation. Defendant's agent for service of process in the State of Texas is Dean Wilkerson, 4950 West Royal Lane, Irving, TX 75063.

## III.

## Jurisdiction and Venue

3.01　　Pursuant to 28 U.S.C. §1331, jurisdiction lies in the United States District Court for the Northern District of Texas, as this action involves a question of the application of federal law, including the Family and Medical Leave Act of 1993 (the "FMLA").

3.02　　Venue for Plaintiff's causes of action stated herein lies in the Northern District of Texas because the acts alleged in this Complaint took place, in whole or in part, within the boundaries of this District pursuant to 28 U.S.C. §1391.

## IV.

## Factual Allegations

4.01　　Plaintiff began working for Defendant on or about October 28, 1996 as an Editorial Assistant (level 3) with a salary in the mid $20,000.

4.02　　Plaintiff was a model employee. She had an outstanding performance record until the year 2020. Plaintiff dedicated twenty-four (24) years of her professional career to Defendant.

4.03　　In November 1997, Plaintiff received a promotion to a Meetings Assistant (level 4) with a salary increase.

4.04　　In September, 1999 Plaintiff was promoted to Meeting and Education Coordinator (level 5) with a salary increase.

4.05　　In January 2004 Plaintiff was promoted to Educational Meetings Manager (Level 7)

PLAINTIFF'S ORIGINAL COMPLAINT
CHRISTINE WELLER V. AMERICAN COLLEGE OF EMERGENCY PHYSICIANS.

2

with a salary increase to $53,956.

4.06    Over the years at Defendant, Plaintiff received 16 raises. Plaintiff was making a salary of $88,881 when terminated on November 12, 2020.

4.07    Debbie Smithey ("Smithey"), Director of Educational Meetings was Plaintiff's direct supervisor from 1997-2020.

4.08    Plaintiff was first diagnosed with a meniscus tear of her left knee in August, 2018. Plaintiff waited to have the partial meniscectomy until after the annual meeting that occurred in late September/early October to not leave Plaintiff's department short staffed. Plaintiff also felt pressured from Debbie Smithey to attend the meeting. Plaintiff attended the annual meeting in San Diego and was in pain.

4.09    During the 6 days in San Diego Plaintiff was required to work very long hours. Two of the 6 days Plaintiff worked from 7:00am – 12:00am. Plaintiff was on her feet most of the meeting that caused her knee to feel worse. The meeting was at the San Diego convention center and is very large, so a lot of walking was to be expected.

4.10    On the last day of the meeting, Plaintiff was having drinks/dinner with several of the staff in Plaintiff's department. During a casual conversation Plaintiff had with Debbie Smithey, Plaintiff said that she told her physician that she wouldn't have the surgery before the annual meeting. Smithey said "yes, because you wouldn't have a job".

4.11    On October 8, 2018, Dr. Manuj Singhal performed the partial meniscectomy on Plaintiff's left knee. Plaintiff returned to work the following week even though Plaintiff was still in severe pain.

4.12    Plaintiff felt pressure to return to work from Debbie Smithey. Plaintiff felt like she

didn't believe that Plaintiff was in so much pain. Plaintiff continued to work during this time, limping and often using ice packs in the office. Plaintiff saw Dr. Manuj several times because Plaintiff was still in severe pain. He couldn't figure out what was wrong and ordered several tests including lupus and an MRI.

4.13    In November 2018 Plaintiff had the MRI and it revealed Plaintiff had a stress fracture. Plaintiff continued to go to work, only missing when she absolutely had to.

4.14    In December 2018 Dr. Singhal put Plaintiff on FMLA so the fracture could heal. Plaintiff asked him if she could work a few days a week because of her workload and he agreed.

4.15 During the end of November/beginning of December 2018 Plaintiff was very busy preparing for a very important meeting and worked full days. The ACEP19 planning meeting was 2 days at the beginning of December. During that meeting Plaintiff went to Defendant's office with an ice machine. It was obvious to everyone in the meeting that Plaintiff was in pain.

4.16    After that meeting was over, Plaintiff worked few days a week in the office due to Plaintiff's workload instead of taking the full FMLA. Debbie Smithey interfered with Plaintiff's FMLA leave by telling Plaintiff that she had to get all of the work done even though Plaintiff was out on intermittent FMLA.

4.17    During that time, Plaintiff was not permitted to work from home. Another staff member in a different department was permitted to work from home during that time though. Dean Wilkerson, Executive Director (CEO) at the time, approved Plaintiff to work from home at the end of her FMLA.

4.18    During this time, Plaintiff had severe depression and anxiety due to the stress from work and constant pain in her knee. Plaintiff went to see a licensed counselor and psychiatrist.

Plaintiff also had experienced more migraines than usual from the stress she was under.

4.19   Plaintiff developed another meniscus tear of her left knee in 2019. In October 2019, Dr. Alexander Glogau performed a partial meniscectomy and Plaintiff was put on FMLA. Plaintiff was in severe pain after this surgery.

4.20   Plaintiff continued to go to work, only missing when she absolutely had to due to the pain.  Later, Plaintiff was put on intermittent FMLA and worked from home when it was necessary for her to do so due to the pain.  During this time Debbie Smithey occasionally pressured Plaintiff to come into the office instead of working from home, even though it was approved by Dean Wilkerson and Pamela Autry, Human Resources Director.  In a text message Plaintiff sent Smithey around the end of October or beginning of November after telling her Plaintiff had worked from home that day, Smithey responded "ok, but you are needed in the office".

4.21   On November 7, 2019, Plaintiff's mother passed away suddenly from a heart attack. Plaintiff was severely depressed due to her mother's passing, the stress of work, and the constant pain she was in.  Plaintiff continued to see a licensed counselor and psychiatrist. Plaintiff also continued to have migraines as well.

4.22   After developing a stress fracture and meniscus tear of Plaintiff's RIGHT knee in December, 2019, Dr. Glogau put Plaintiff on FMLA for 6 weeks. He told Plaintiff that she had two options – have a chondroplasty to fix the fracture, or rest so the fracture could heal.  Plaintiff opted to take the 6 weeks and rest.  Plaintiff did not work at all during this time so she could concentrate on healing.

4.23   When Plaintiff returned to work in January, 2020, Plaintiff noticed a marked difference in the way Plaintiff was treated by Debbie Smithey, Michele Byers, Managing Director,

PLAINTIFF'S ORIGINAL COMPLAINT
CHRISTINE WELLER V. AMERICAN COLLEGE OF EMERGENCY PHYSICIANS.

5

Education and Management Services, and Robert Heard, COO.   Plaintiff was told from a staff member in the meetings department they were not happy that Plaintiff was out on medical leave. Before that Plaintiff had a good working relationship with Michele and Bobby.

4.24   In September, 2020, Plaintiff was told by Dr. J. Field Scovell, that Plaintiff needed a left knee replacement because it was bone on bone. He instructed Plaintiff to use a cane and not put stress on her knee.  Dr. Scovell referred Plaintiff to Dr. Kurt Kitziger, who Plaintiff saw on September 23rd.   Plaintiff told Dr. Kitzinger that she wasn't ready to have the replacement yet, partly due to the upcoming annual meeting (ACEP20) that was occurring October 26-29, 2020 and would most likely schedule it for January. He agreed and ordered physical therapy twice a week for 6 weeks. Plaintiff sent Mary Beth Collins, HR Manager, an email shortly after telling her that Plaintiff needed a knee replacement and Plaintiff was waiting until after ACEP20.  Plaintiff also verbally told Debbie Smithey the same thing during one of Defendant's bi-weekly calls shortly after. Plaintiff told Debbie that Dr. Kitziger ordered Plaintiff to go to PT twice a week for 6 weeks and that Plaintiff would need to be out for those appointments.

4.25   Plaintiff went to PT for a few weeks then stopped because Plaintiff was too busy to take time off due to Plaintiff's busy workload. Plaintiff also told Debbie during that meeting that Plaintiff was walking with a cane and had constant pain in both knees. Shortly after during a Zoom meeting with Toni McElhinney, Senior Manager, Conventions and Meetings, Plaintiff told her that she needed a knee replacement and was going to PT.  Toni is "second in command" in the meetings department.

4.26   Plaintiff scheduled the knee replacement for January 11, 2021 during her November 17th appointment with Dr. Kitziger.  Plaintiff would have had to take money out of her 401K to pay

PLAINTIFF'S ORIGINAL COMPLAINT
CHRISTINE WELLER V. AMERICAN COLLEGE OF EMERGENCY PHYSICIANS.

6

for the portion of the surgery that her COBRA insurance wouldn't cover. Plaintiff continued to go to PT twice a week to prepare for the surgery.

4.27 When Debbie Smithey met with Plaintiff on September 3, 2020 for Plaintiff's 30-minute hurried "complete appraisal discussion" she did not go through the written review with Plaintiff. Smithey told Plaintiff it was very bad and for Plaintiff to read it after Plaintiff received it via email. Smithey asked Plaintiff if she was happy with her job and Plaintiff told her yes. Smithey stated she had to take on supervising Shannon Campbell, Educational Meetings Coordinator, and that she needed someone in Plaintiff's job to do this.

4.28 In December, 2019, Smithey was floating around the idea of supervising Shannon and asked Plaintiff what she thought. Plaintiff agreed but much to her surprise this was a negative in Plaintiff's review. Plaintiff had supervised Shannon previously but it was very difficult due to her not respecting Plaintiff and the incident when she verbally attacked Plaintiff.

4.29 During this review period Plaintiff's job had changed dramatically because Defendant moved to an all-virtual format for the annual meeting due to COVID, therefore Plaintiff was learning brand new duties. Plaintiff asked Debbie after the complete appraisal discussion if she could meet with her on a bi-weekly basis and she agreed. During those 30-minute meetings Smithey and Plaintiff reviewed Plaintiff's projects. Smithey did not give Plaintiff updates on her performance. Plaintiff was not put on a formal performance improvement plan. A PIP is standard practice at ACEP. At the end of the written review it said "we will revisit your performance on November 6, 2020 to ensure it has improved." Smithey told Plaintiff that Mary Beth Collins wanted to give Plaintiff 30 days to improve but Smithey told her she wanted it to be 60 days.

4.30 In early October 2020, Plaintiff applied for another position at Defendant but did not

get called for an interview.

4.31    When Mary Beth scheduled the "update of performance" call for November 12th, Plaintiff fully expected Smithey to tell Plaintiff she had improved and was on track with Plaintiff's performance because Plaintiff had worked over and beyond what was expected of her during that time.

4.32    During the call Smithey told Plaintiff that she did not improve at all and was being terminated. Smithey listed just a few examples. One example was her having to supervise Shannon and needing someone in Plaintiff's position to do this. Plaintiff told her it was her idea and why was she using this against Plaintiff. Smithey had no response. Smithey told Plaintiff that her performance had been lacking the last few years and Plaintiff asked her why she continued to give her exceptional/successful reviews. Smithey had no response. Plaintiff also told her "so it was ok for Shannon to verbally harass me, lie on her timecard, and engage in poor performance, but you are terminating me?". Again, Plaintiff received no response from her. Plaintiff also told both Mary Beth and Smithey that it was obvious they were terminating Plaintiff based on her medical condition. At that time Debbie Smithey left the Zoom meeting and Mary Beth Collins showed Plaintiff the separation agreement outlining that Plaintiff would receive 12 weeks pay if Plaintiff signed it within 21 days. After that Plaintiff told Mary Beth that Plaintiff felt like they were terminating her because of her medical condition and Mary Beth stated "I don't know, you'll have to ask Debbie". There was not an HR Director during the last portion of this review period. In the past the HR Director handled the PIPs & terminations. Mary Beth was filling in for the Director.

4.33    Plaintiff worked over and above during those 60 days. Plaintiff did not get a chance to say this during the termination call. Some of those examples include:

PLAINTIFF'S ORIGINAL COMPLAINT
CHRISTINE WELLER V. AMERICAN COLLEGE OF EMERGENCY PHYSICIANS.

8

- Worked overtime because of Plaintiff's heavy workload.
- Scheduled and co-conducted with Juno many training sessions for speakers and committee members so they could learn the new virtual platform. At that time, Plaintiff didn't understand the platform because she wasn't given the proper training.
- Reviewed hundreds of presentations and caught many errors, took assignments from other staff in the department because Smithey said they were overloaded with other work.
- Picked up work from Shannon at the directive of Debbie because she had other priorities to work on because she was behind in her work and had to concentrate solely on those duties.
- Was more vocal and demonstrated leadership in different meetings (this was in Plaintiff's 19-20 review).
- Worked 70 hours the week of ACEP20 (annual meeting).
- Plaintiff did not take any of the 3 comp days she earned due to her workload. Plaintiff was scheduled to take a comp day on October 30th but Smithey scheduled work for Plaintiff to do so Plaintiff could not take it.
- Plaintiff was left out of the loop for many things related to the virtual meeting by Shannon Campbell and Raul Cabello, Meeting Planner, and expressed that to Smithey. She agreed with Plaintiff and said she was going to address it with those staff. Plaintiff was not able to perform her job efficiently because of this.
- Plaintiff received an email from Smithey complimenting Plaintiff on taking

PLAINTIFF'S ORIGINAL COMPLAINT
CHRISTINE WELLER V. AMERICAN COLLEGE OF EMERGENCY PHYSICIANS.

9

> control on the project of scheduling virtual presentations. Shannon had been in charge of this project and she had been lacking in her duties. It was very important to get all presentations recorded because the meeting was so close and Plaintiff diligently continued to follow up with numerous presenters.
>
> - After the annual meeting had concluded, Plaintiff contacted Dr. Christopher Amato, course director for the *Pediatric Emergency Medicine Assembly* meeting, about completing the planning. He said he was surprised that Plaintiff was able to work on it this so quickly after the end of the annual meeting.

4.34   During the entire time Plaintiff was with ACEP Plaintiff received many accolades from ACEP members (physicians) and others that Plaintiff worked closely with on various projects. A lot of these people were Chairs of the Educational Meetings Subcommittee and gave Plaintiff gifts and cards at the end of their tenure on the Committee. Some of those names include Christopher Amato, MD, FACEP, Ernie Wang, MD, FACEP, Robert Strauss, MD, FACEP, Tracy Sanson, MD, FACEP, Sean Fox, MD, FACEP, Matt Strehlow, MD, FACEP, Michael Granovsky, MD, FACEP, Janis Provinse, BSN, Jeffrey Tabas, MD, FACEP, Matthew Bitner, MD, FACEP, Thomas Kelly, MD, FACEP, Carlo Rosen, MD, FACEP, Jay Kaplan, MD, FACEP, Christian Tomaszewski, MD, FACEP, Diane Birnbaumer, MD, FACEP, Kevin Klauer, DO, Marco Coppola, DO, FACEP, Jonathon Davis, MD, FACEP, Mary Ellen Fletcher (ACEP staff), David McKenzie (ACEP staff).

V.

FIRST COUNT

**FAMILY AND MEDICAL LEAVE ACT DISCRIMINATION, INTERFERENCE AND RETALIATION**

5.01    The foregoing paragraphs in this Complaint are incorporated in this count by reference as fully as if set forth at length herein.

5.02    When Defendant fired Plaintiff on November 12, 2020, Plaintiff had just informed her supervisor that she would have a knee replacement surgery after ACEP20. However, Smithey fired Plaintiff anyway, a clear FMLA violation.

5.03    Plaintiff's termination resulted from discrimination and/or retaliation because both discrimination and retaliation were motivating factors in the termination. Plaintiff's termination on November 12, 2020, occurred only after Plaintiff told her supervisor Smithey that she would require FMLA leave in January 2021 for knee surgery. Thus, there was temporal proximity of the retaliation discharge to expiration of Plaintiff's first FMLA leave.

5.04    Plaintiff's termination was also an act of interference with Plaintiff's second FMLA leave. The interference and the filing of the second FMLA claim were related because Plaintiff had notified her manager of the fact that she was making the second filing, and was prepared to qualify for her eligible leave when Defendant fired her to interfere with the filing.

5.05    Defendant was subject to the provisions of the FMLA. Defendant employed at least fifty (50) employees within a seventy-five (75) mile radius of Plaintiff's work site for twenty (20) or more work weeks in the prior or current calendar year.

5.06    As a result of the interference, discrimination, retaliation and termination by

Defendant, Plaintiff has suffered significant financial loss, including backpay and front pay and the loss of benefits of her employment, including health insurance. Plaintiff is entitled to front pay and other equitable relief. Discrimination and retaliation were motivating factors in Plaintiff's termination.

5.07   The aforementioned acts were and are a willful violation of the FMLA, and entitle Plaintiff to recover damages as provided by 29 U.S.C. § 2617, including liquidated damages. Plaintiff further seeks reinstatement to her position or a comparable position with reinstatement of benefits and seniority time, and with appropriate injunctive relief.

5.08   As a result of Defendant's actions, Plaintiff has found it necessary to hire the services of the undersigned attorneys, for which Plaintiff seeks further relief.

5.09   Plaintiff is entitled to an award of attorney's fees, expert fees, and costs.

## VI.

## JURY TRIAL DEMANDED

6.01   Plaintiff hereby demands trial by jury of all claims for which she is entitled to demand a jury trial.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that upon final trial, Plaintiff have and recover the following relief against Defendant:

(1)   Judgment for actual damages in the amount of past and future lost earnings and benefits and damages to past and future earnings capacity;

(2) Liquidated and/or statutory damages;

(3) Punitive/exemplary damages;

(4) Preliminary and permanent injunctive relief reinstating Plaintiff to her position with full seniority and other benefits as if she had never been discharged;

(5) Prejudgment and postjudgment interest at the maximum legal rate;

(6) All costs of court;

(7) Attorney's and expert fees; and

(8) Such other and further relief to which Plaintiff may be justly entitled.

DATE: January 29, 2021

Respectfully Submitted,

**KILGORE & KILGORE, PLLC**

By: *W. D. Masterson*
W.D. Masterson
SBN: 13184000
wdm@kilgorelaw.com
3109 Carlisle Street
Dallas, Texas 75204
(214) 969-9099 - Telephone
(214) 953-0133 - Facsimile

**ATTORNEYS FOR PLAINTIFF, CHRISTINE WELLER**